HADAD, et al. *v.* BOOTH, et al.

No. 39730          October 10, 1955          82 So. 2d 639

*Brunini, Everett, Grantham & Quin, J. Stanford Terry,*
Vicksburg, for appellants.

*W. J. Vollor,* Vicksburg, for appellees, George T. Booth, Sr., et al., d/b/a George T. Booth & Sons.

*Ramsey & Ramsey,* Vicksburg, for appellees, Dan Cole and Edward L. Clark, d/b/a B & G Electric Company.

ETHRIDGE, J.

This suit was instituted in the Circuit Court of Warren County by John Hadad, Jr. and Cletus Hadad, appellant, against appellees George T. Booth, Sr., and others, a partnership doing business as George T. Booth & Sons (hereinafter referred to as Booth or the plumbers) and against Dan Cole and Ed L. Clark, doing business as B & G Electric Company, a partnership (hereinafter referred to as Cole or electric company). The action was for damages for negligence of the plumbers and the electric company in installing a natural gas furnace or heater in the attic of the home being constructed by Hadad, and for resulting damages when the heater set the house on fire and badly damaged it. The trial court heard testimony for both sides, and then gave a peremptory instruction for defendants.

In June 1951 Mr. and Mrs. Hadad decided to construct a new home in the City of Vicksburg. It was of a substantial size, its final cost being $30,800. Hadad was his own contractor, and employed R. W. Ables as his supervisor or superintendent of the construction. He contracted for the electric wiring of the house with B & G Electric Company, and that work was done by Cole, apparently under an oral agreement. Booth was in the plumbing business. Hadad made a written contract with that partnership in the form of a letter, not dated, from Booth to Hadad as follows: ''We propose to furnish all labor & materials for roughing in & setting of fixtures & equipment to be furnished by you for the sum of $1020.00 tax included. This price includes all permits & fees exclusive of deposits for services normally required of the owner of the dwelling.'' Other than these two contracts for electric and plumbing work, apparently Hadad himself supervised the construction of the house through Ables, his superintendent. He also purchased directly for himself all of the materials that went into the structure.

Sometime before the house was completed in November 1951, Hadad and Ables drove to Jackson, where Hadad purchased from the Wholesale Plumbing Company, of which O. C. Campbell was the manager, a Reznor suspension type of central heater. This kind of heater is one which is made for suspension from the ceiling. It contained a fan which would blow the hot air through metal ducts into the several rooms. It was a 300,000 B. T. U. heater, designed so that one-half of its capacity was available to be used on each side separately from the remainder of the unit. The total capacity of the heater was more than was needed for Hadad's house, but Hadad intended to use only one side of it, with half of its maximum capacity. The heater was delivered to the house by the seller, and Ables and other employees of Hadad put it up in the attic, in order, he testified, to get it out of the way of the workmen downstairs. Ables said that

he had no intention of installing the heater or locating its position, because it was necessary for a licensed plumber and an electrician to do this. Hadad stated that he saw the heater in the attic after it was placed there by Ables; that he instructed Ables to put a piece of asbestos material under it in order, Ables said, to keep any oil or grease from falling off the fan's motor into the ceiling of the room below.

Hadad testified that the only thing that Ables was doing was helping the plumbers and electricians to put the heater up in the attic; and that Ables did not install the heater. Hadad asked his architect, who drew the plans for the house, to put the heater in the attic because he understood that was the way "they were installing heaters." He told Ables to "reinforce the location where the heater was to be placed." He thought that the heater was designed for the attic, and the blueprints called for its location. There are no architect's blueprints or plans in the record. He saw the heater after Ables had placed it in the attic. Hadad said that he did not know whether it was a suspension type of heater; but that he told Campbell when he purchased it that it was going to be placed in the attic. There was no discussion with Campbell about how the heater was to be set. All that Ables did was to place the heater in the attic in order for the plumber to come along and install it. When it was installed, only the burners on one side were connected and in operation. Hadad said that Booth and Cole had agreed to and did install the heater.

Several days before November 19, 1951, Booth connected the gas pipes to the heater and placed a new valve in it in substitution for a defective valve. Cole connected electric wires to a utility-box on the heater, and connected an electric thermostat to it. Neither attempted to suspend the heater from the ceiling of the attic, as should have been done, but left it setting on the asbestos over the wood flooring. On the morning of November 19 Booth turned one side of the heater on and left the house

shortly thereafter, after some delay to make sure that it was operating satisfactorily. Around 2 o'clock that afternoon, November 19, Hadad was at his father's house next door when he was advised that the house was full of smoke. He ran over to it, went into the attic, and turned off the gas switch leading to the furnace. He noticed that the heater was red hot, and, he stated, so advised Booth, although Booth denied this. He immediately got Booth and Cole to come over to the house and to check the heater. Cole remained there for about thirty minutes and Booth stayed about two hours, examining the unit in order to ascertain whether it was working right. The house was too cold for the thermostat to work automatically, so Booth worked it back and forth several times manually. He determined that the heater was working satisfactorily, so he returned the keys to Mrs. Hadad. Both she and her husband said that Booth advised them that the heater was working all right, and that he did not think they would have any more trouble with it. All of Hadad's furniture had been moved into the house. The family planned to move in the next day. Early the next morning, around 1:30 a. m., November 20th, the house caught on fire. No one was occupying it, and no one had been in it after Booth had left around 4:00 p. m. on the afternoon before. The house and furniture were considerably damaged by the fire, and this suit was brought for the resulting damages.

The testimony of Joseph Hoseman, Chief of the Vicksburg Fire Department, and of J. D. McDonald, Deputy State Fire Marshal, who supervised the fighting of the fire and examined its effects thereafter, along with other testimony, establishes by the great weight of the evidence that the cause of the fire was the installation of the heater on the floor of the attic with a zero clearance. It should have been suspended from the ceiling with several inches of clearance under it. The heater was installed by placing it on a floor of pine sheeting in the attic. On top of this flooring and under the heater was

a quarter-inch asbestos board. Chief Hoseman stated that Booth told him after the fire that he had had trouble with one of the valves when he installed the heater, but that he had put it in satisfactory operation. In Hoseman's opinion the burners on the heater were to close to the floor, the floor became overheated, and the radiation from the heater went through the asbestos board to the wood surface, thereby igniting it. This asbestos board will conduct heat. There were three or four safety devices on the heater, which could cut it off, but with the installation as made, he was of the opinion that it would have eventually ignited the flooring. McDonald testified that Booth told him "he had put the heater up," and that he had had to replace a broken magnetic valve; that they had trouble with it a few days before and had reworked it. Cole testified that the only thing he did was to attach the electric wiring to the heater and to a thermostat. Booth's version was that his job was simply to rough-in the pipe for the heater, and then to hook the gas pipes onto it. He said that Hadad asked him to light it, and that was when he first observed a broken valve, which he replaced; that he had nothing to do with placing or locating the heater, and he did not know whether this was a suspended or a floor type. When he connected it, all of the ducts had been "tied in." He was furnished plans and specifications before he did the plumbing, but they did not relate to connecting up or installing the heater.

O. C. Campbell, who sold the heater to Hadad, testified that it was a suspended type of heater, and was not designed to sit flat on the floor; that such an installation would be improper, and an asbestos board under it would simply conduct the heat through it. In his opinion the fire was caused by the method of installation. Campbell said that he told Hadad not to install it in an attic, but in a closet or utility room downstairs. However, he further said that the heater was a suspended type, and after they told him it was to be put in the attic, he warned

Hadad not to have zero clearance. Hadad in effect denied this.

■ ■ Where the trial court has given a peremptory instruction for defendants, the rule is that the plaintiff's evidence must be taken in its most favorable light, and where conflict in the evidence exists, plaintiff's evidence and the reasonable inferences from it must be taken as true, since the case was not submitted to a jury to resolve the disputed issues of fact. ■ ■ However, we think that the trial court was correct in giving a peremptory instruction for appellees Cole and Clark, doing business as the B & G Electric Company. The judgment is affirmed as to them. The electric company had an oral contract to do the electrical wiring in the house. Hadad testified that Booth agreed to install the heater. All Cole agreed to do, it would seem, was to connect the electric power lines to the two wires in the heater's utility box, and to connect up the room thermostat. Interior wiring in the heater was done by the manufacturer. The electric company had no agreement to locate or install the heater. So it had no duty to appellants in that respect.

■ ■ On the other hand, the evidence was sufficient to make an issue for the jury as to the liability of George T. Booth, Sr., and others, doing business as George T. Booth & Sons. Booth's written contract with Hadad obligated them "to furnish all labor and materials for roughing-in and setting of fixtures and equipment to be furnished by you for the sum of $1,020.00 tax included." This contract stated that it included all permits and fees "for services normally required of the owner of the dwelling." This would manifestly include permits and fees for inspection by the city as to the adequacy of the installation of the "fixtures and equipment." The agreement is crudely drawn, and is somewhat ambiguous. It must be considered in the light of all the circumstances and the conflicting testimony of Hadad, Booth and others about what Booth had contracted to do. ■ ■ Whenever the terms of a contract are susceptible of more than one

interpretation, or an ambiguity arises, or the intent and object of the contract cannot be ascertained from the language employed, parol evidence may be introduced to show what was in the minds of the parties at the time of making the contract. ██ The ambiguity may arise from words which are uncertain when applied to the subject matter of the contract. 20 Am. Jur., Evidence, Sec. 1147; Traders' Insurance Company v. Edwards Post, 86 Miss. 135, 38 So. 779 (1905). 53 Am. Jur., Trial, Sec. 266 states: ██ ██ "Where a contract is to be construed by its terms alone, it is the duty of the court to interpret it; but where its meaning is obscure, and its construction depends upon other and extrinsic facts in connection with what is written, the question of interpretation should be submitted to the jury, under proper instructions." ██ It is for the jury to determine what is the agreement of the parties, where there is uncertainty in a written contract because of ambiguity or doubtfulness. 53 Am. Jur., Secs. 267, 269; Harris v. Williams, 43 So. 2d. 364 (Miss. 1949); Frisby v. Grayson, 216 Miss. 753, 63 So. 2d 96 (1953). It was a jury issue as to whether Booth's contract obligated him to install the heater.

██ If the jury finds that Booth had that obligation, then the rule laid down in American Heating & Plumbing Company v. Grimes, 192 Miss. 125, 4 So. 2d. 890 (1941) is pertinent. In that case appellant was the contractor for installation of a gas heating system in a school. The installing contractor was required to use his own judgment in its installation. The heater was placed within a wall with inadequate clearance on each side, and with no noncombustible insulation. The general contractor then erected the outside walls around the heater. Appellant contended that it did not place the studs or wooden laths in proximity to the heater, but that this was done by the general contractor. However, the court affirmed judgment for the plaintiffs-appellees and said: "One who for a valuable consideration installs a dangerous instrumentality, of which a gas heater is an example, is

in such installation charged by law (1) with knowledge of the particular dangers characteristic of the instrumentality and of the manner and means by which the danger or dangers are likely to eventuate into actual harm, and (2) with the duty to use that degree of care which is commensurate with the danger, to guard or insulate against it. Such a rule has its roots in an impelling necessity in the promotion of the safety and security of life and property—it has its foundation in the essence of the social compact.

"And as a corollary of what has just been said, when the installation is in a structure which, in the main, is being erected by another contractor, and the work done or being done by the other contractor about or near the heater is such as to make the situation of the heater dangerous, the party who has the contract for the installation of the heater must inform the owner that the work as done or being done by the other contractor will cause the heater to become dangerous and likely to set fire to the structure, thereby forewarning the owner so that he may have the dangers created by the other contractor removed or remedied; and in the event the installer of the heater fails so to forewarn he will be liable for the consequent damage to the same extent as if he had himself done the work which brought about the dangerous situation. A fortiori, the installer of such an instrumentality is subject to liability if by word or deed he leads those who are to use the instrumentality to believe it to be of a character, or in a condition or situation safer than he knows it to be."

On the other hand, if the jury should believe that Hadad selected and prepared the place of location of the heater, and that the "setting of fixtures and equipment to be furnished by" Hadad meant that Booth was simply to connect the gas thereto, then there would be no liability against Booth because Hadad, his own contractor and builder so far as this installation was concerned, approved and adopted the place for and the

manner of the installation. Trustees of the First Baptist Church of Corinth v. R. N. McElroy, 78 So. 2d 138 (Miss. 1955).

▮▮ Hadad was his own contractor, working through his superintendent Ables. O. C. Campbell testified that he told Hadad and Ables when they were buying the heater that it was of a type which should be suspended from the ceiling with some clearance under it. Hadad in effect denied this statement. However, if the jury should believe from the evidence that Campbell so advised them, then it would have the right to find that the fact that heater was installed in a dangerous manner was as well known to the owner as it was to Booth, and that a warning to Hadad would have been ineffectual. Such a finding of fact would bring into play the exception referred to in American Heating Company v. Grimes, supra, as follows: "It may be that an exception is to be made in what is said in the next foregoing paragraph, namely, that if the danger created by the other contractor is known to the owner and is well understood by him as one obviously likely to produce harm and so much so that a warning to him would have been but an idle ceremony and of no service to the owner, then the failure to warn may be excluded as a proximate or contributing cause; . . ." This exception was applied to facts somewhat different from the present case in Trustees of the First Baptist Church of Corinth v. McElroy, supra. There are no architect's plans and specifications in this record, but apparently they did not deal with installation of the heater.

▮▮ The doctrine of res ipsaloquitur is not relevant here, because the great weight of the evidence shows that the fire was caused by the defective installation of the heater. Cf. Plunkett v. United Electric Service, 214 La. 145, 36 So. 2d 704 (1948); Anno., 3 A. L. R. 2d 1448 (1949). The judgment of the circuit court is affirmed in part, as to appellees Cole and Clark, doing business as B & G Electric Company. It is reversed in part, as to appellees

Booth, et al., doing business as George T. Booth & Sons, and remanded for further proceedings consistent with this opinion.

Affirmed in part, and in part reversed and remanded.

*Roberds, P. J.,* and *Lee, Kyle* and *Gillespie, JJ.,* concur.